**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

JOHN DOE,

Plaintiff,

- against -

WELLS FARGO BANK, N.A.,

Defendant.

-------------------------------------------------------------------X

**Case No. 1:26-cv-05807-GHW**

**FIRST AMENDED COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

JOHN DOE ("Plaintiff"), by and through his attorneys, JOSEPH & NORINSBERG LLC., against WELLS FARGO BANK, N.A. ("Defendant"), alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to retaliation provisions of the (i) **Sarbanes-Oxley Act**, 18 U.S.C. § 1514A; and (ii) **New York Labor Law**, § 740(2) [b] & [c], ("NYLL"); and any other claim(s) that can be inferred from the facts set forth herein and seeks damages to redress the injuries Plaintiff suffered as a result of being retaliated against by Defendant on the **basis of Plaintiff's Whistleblowing activities.**

2. Plaintiff was at all times a hardworking and dedicated employee, with an impeccable reputation in the municipal finance industry. Plaintiff joined Defendant Wells Fargo in September 2023 to rebuild investor trust and enhance Defendant's credibility, particularly given its troubled history with regulatory violations and unethical practices. However, shortly after joining Defendant, Plaintiff uncovered an alarming and unlawful scheme in which Defendant manipulated municipal bond pricing to the detriment of retail investors

by suppressing credit risk information and inflating bond prices for profit. Further, Plaintiff's weekly investment reports, which were meant to reflect objective credit analysis, were routinely altered by senior leadership to remove any negative assessments before publication. Disturbed and alarmed by the blatant market manipulation and its devastating consequences on unsuspecting investors, Plaintiff began raising internal complaints, all of which are documented in business emails. Rather than addressing these concerns, Defendant retaliated against Plaintiff by issuing Plaintiff a pretextual performance rating, isolating him, assigning him grueling hours, silencing his communications with clients, and ultimately fabricating a pretext to terminate him based on a collaborative report that leadership itself had drafted, edited, and approved.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is proper under 18 U.S.C. § 1514A and 28 U.S.C. §§ 1331 and 1343.

4. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that the claims alleged herein took place within the Southern District of New York.

## PROCEDURAL PREREQUISITES

6. Plaintiff timely filed a complaint, upon which this Complaint is based, with the Occupational Safety and Health Administration ("OSHA") pursuant to 18 U.S.C. § 1514A(b).

7. More than one hundred-eighty (180) days have elapsed since Plaintiff filed the foregoing complaint, and this matter has therefore been timely commenced.

## PARTIES

8. At all times material, Plaintiff was and is a male resident of the State of New York.

9. At all times material, Plaintiff was and is a "person" and an "employee" of Defendant and entitled to protection as defined by the Sarbanes-Oxley Act and NYLL.

10. At all times material, WELLS FARGO BANK, N.A. ("Defendant" or "The Bank") was and is a multinational financial services company providing banking, insurance, investments, mortgage, and consumer and commercial finance through its various subsidiaries, headquartered at 420 Montgomery Street, San Francisco, CA 94104.

11. At all times material, Plaintiff worked at Defendant's New York office located at 30 Hudson Yards, New York, NY 10001.

12. At all times material, Defendant employed and still employs more than 1,000 employees.

13. At all times material, Defendant was and is an "employer" under the Sarbanes-Oxley Act and NYLL.

## MATERIAL FACTS

14. On or about September 27, 2023, Plaintiff began working for Defendant as an Executive Director, Head of Municipal Strategy, earning a base salary of two hundred seventy-five thousand dollars ($275,000) annually. In addition, Plaintiff received a bonus of two hundred twenty-five thousand dollars ($225,000) for Fiscal Year 2024, consisting of one hundred sixty-eight thousand seven hundred fifty dollars ($168,750) as a cash bonus and fifty-six thousand two hundred fifty dollars ($56,250) in equity awards.

15. At all times material, Plaintiff worked under the supervision of the Head of the Company's Municipal Division, Chuck Peck ("Mr. Peck"), Co-Head of Municipal Sales Chris Lee ("Mr. Lee"), and Co-Head of Municipal Sales and Trading Matthew Rosenberg ("Mr.

Rosenberg"). Plaintiff also worked under the supervision of Julie Burger ("Ms. Burger") and Mark Burns ("Mr. Burns"), the leaders of the Public Finance and Banking team of the Municipal Products Group, who routinely intervened in Plaintiff's published work, modifying or removing content that presented unfavorable market views.

16. As the Executive Director, Plaintiff's duties and responsibilities included, but were not limited to, rebuilding trust with investors and issuers, joining weekly calls, and meeting clients, issuers, and investors. Additionally, Plaintiff was responsible for preparing weekly investment reports along with Mr. Lee, Mr. Rosenberg, and Chief Operating Officer of Municipal Products Valerie Bull ("Ms. Bull"). Notably, this report required approval by a Municipal Principal such as Mr. Rosenberg, Mr. Lee, or Ms. Bull.

17. Throughout Plaintiff's tenure, senior management required Plaintiff to submit every research report and market publication for mandatory pre-clearance by Mr. Rosenberg and Mr. Lee and, in many cases, by Mr. Peck and members of the public finance and banking team, including Ms. Burger and Mr. Burns.

18. Plaintiff enjoyed his work, and as a highly respected member of the financial industry, expected a long, successful career with Defendant.

19. Unfortunately, everything changed for Plaintiff when he began making vocal complaints of company wrongdoings, violations, and blatant market manipulation schemes that hurt the most vulnerable clients.

20. Notably, Defendant has a long-standing, well-documented record of regulatory violations and misconduct, having repeatedly faced penalties from oversight authorities. For example, in 2018, regulators imposed a punitive, seven-year asset cap of approximately one point nine five trillion dollars ($1,950,000,000,000) as a direct consequence of the 2016 scandal

in which Defendant opened millions of unauthorized customer accounts. That asset cap was finally removed in or about June 2025, following years of high-profile compliance failures and a sustained effort under new leadership to reform the firm. See Exhibits Y-Z**.**

21. For context, the municipal market is predominantly driven by retail investors, who account for nearly 80% of all municipal bond purchases. As a result, when the market experiences rate hikes or credit shocks that cause municipal bond values to decline, it is primarily retail investors, such as individual retirees and everyday savers, who absorb the financial losses. In contrast, major broker-dealers like Defendant typically hold minimal municipal bond exposure on their balance sheets. Instead, they offload risk and pass potential losses down to their retail clients.

22. Defendant operates a substandard municipal banking business and a middling municipal trading operation. Upon information and belief, municipal issuers, including state and local governments, have expressed concerns about engaging Defendant for underwriting or trading services due to its documented history of unethical business practices.

23. As a result, Defendant hired Plaintiff, a highly reputable, publicly known, and No. 1 ranked Municipal strategist, to strengthen its credibility in the municipal markets, enhance its track record, build stronger relationships, further financial goals, and position him as the firm's public-facing municipal bond strategist, with regular CNBC appearances, Bloomberg media citations, and weekly reports distributed to institutional clients.

24. Plaintiff brought more than eighteen years of fixed income experience to this role and had published over one thousand research reports without a single plagiarism allegation at the time the Company had hired him.

25. Indeed, Plaintiff was greatly qualified for his position, given his extensive and impressive

resume and his highly coveted insight by press and government officials alike.

26. As such, Defendant highlighted and marketed Plaintiff's addition to the team aggressively, and in turn found near immediate improvements in contracts with state and local governments alike.

27. However, in or about June 2024, it quickly became clear to Plaintiff that Defendant intended to manipulate market pricing to boost its municipal division's faltering profits by using Plaintiff's name and reputation.

28. Defendant engaged in a deceptive scheme to manipulate the municipal bond market at the expense of retail investors by offering artificially low interest rates to municipal issuers in order to secure the bonds from the issuer at inflated prices. Notably, as bond prices moved inversely to interest rates, the below-market pricing enabled Defendant to purchase the bonds from the issuers at unreasonably inflated prices. Defendant would then resell these inflated and overpriced bonds to unsuspecting retail investors, many of whom were retirees and other vulnerable buyers. This effectively turned the market into a game of “hot potato,” wherein Defendant incurred outrageous profits while transferring the risk to the unsuspecting investors.

29. The people who suffered most as a result of this scheme were elderly, retired, and vulnerable buyers, who typically bought coupon-paying securities in order to preserve the little nest egg they had. Such securities are not purchased to create wealth, but rather to preserve the funds one has. Unfortunately, these vulnerable buyers had no idea that the products they were purchasing with such faith were overpriced and posed substantial undisclosed risks.

30. In order to conceal the true credit risks associated with these overpriced bonds, Defendant

actively, purposely, and maliciously suppressed negative information regarding the issuers. Unlike other banks such as Barclays and JPMorgan, which maintained large independent research divisions, Defendant eliminated its independent Research department years prior, possibly in an attempt to help conceal its predatory schemes.

31. Overall, Defendant's actions were a deliberate strategy to ensure minimal transparency and hinder any objective analysis of issuer credit-worthiness while Defendant held the bonds on its balance sheets.

32. Plaintiff, a municipal credit analyst, was tasked with producing weekly reports on issuer credit quality. However, his reports were routinely manipulated by his supervisors, Mr. Lee, Mr. Rosenberg, and Mr. Peck, who routinely removed any negative credit assessments or risk indicators prior to publication. As such, the end buyer or the retail investor would not be able to assess the price of the bonds accurately.

33. In almost every instance, investors unknowingly purchased overpriced bonds, which routinely resulted in steep losses once the credit quality of the issuers inevitably declined.

34. When Plaintiff realized the unlawful and unjust scheme Defendant was perpetrating and realized how this unethical scheme could result in another market bubble or could potentially ruin the financial stability and lives of numerous vulnerable buyers, Plaintiff began raising multiple objections to Defendant's unethical practices.

35. Notably, all of Plaintiff's internal protests, complaints, and escalations are documented in business emails and records that can be subpoenaed.

36. On or about October 2, 2023, Plaintiff prepared his first publication on municipal supply and the rate forecast, predicting an increase in interest rates driven by larger Treasury auction sizes and more than five hundred billion dollars ($500,000,000,000) in municipal

supply for 2024. Mr. Peck, Mr. Rosenberg, and Mr. Lee directed Plaintiff to revise his supply estimate downward to approximately four hundred billion dollars ($400,000,000,000) and deleted his written analysis predicting a rise in rates. Mr. Rosenberg told Plaintiff that Wells Fargo's inventory was "heavy" and that the firm could not afford to "spook" retail investors before it had unloaded some of its bonds. Municipal rates rose approximately thirty basis points in October 2023, and 2024 municipal supply reached approximately five hundred thirteen point six billion dollars ($513,600,000,000), vindicating Plaintiff's original forecast. Retail investors suffered substantial losses. See Exhibits A-B.

37. In January 2024, Mr. Lee and Mr. Rosenberg modified Plaintiff's analysis of Build America Bonds, which Plaintiff expected to fall in value following the decision in *Indiana Municipal Power Agency v. United States*. That decision supported the conclusion that federal budget sequestration cuts were an extraordinary event that triggered Extraordinary Redemption Provisions in many bond indentures. Many Build America Bond prices fell from approximately one hundred twenty dollars ($120) to approximately ninety-five dollars ($95) during the first quarter of 2024, and retail investors bore the losses. See Exhibits L-N, V.

38. In March 2024, Ms. Burger and Mr. Peck prevented Plaintiff from discussing Metropolitan Transportation Authority ("MTA") bonds that were at risk because of a delay in congestion pricing. Ms. Burger told Plaintiff that Wells Fargo had a "complicated relationship" with the MTA and could not "take any chances" with negative commentary. Key MTA bonds fell by approximately ten dollars ($10) during 2024, and retail investors bore the losses. See Exhibit E.

39. In May 2024, Mr. Rosenberg took a position in Puerto Rico Electric Power Authority ("PREPA") bonds on behalf of the firm and refused to allow Plaintiff to discuss the substantial risks those bonds posed to investors, including Puerto Rico's 2015 default, the largest municipal bankruptcy in American history causing approximately twenty billion dollars ($20,000,000,000) in retail investor losses, and the fact that no major rating agency would rate PREPA's restructured bonds issued in July 2024. See Exhibits Q, Q-1, R, S.

40. In or about August 2024, Mr. Peck and Ms. Burger refused to allow Plaintiff to publish an analysis on San Francisco's emerging downgrade risks, telling him they were "trying to get business" from the city. Plaintiff's reasoning was straightforward: San Francisco could not carry a AAA rating when the United States government itself was rated AA+. Fitch Ratings, one of the world's leading credit rating agencies and a Nationally Recognized Statistical Rating Organization designated by the U.S. Securities and Exchange Commission, subsequently revised San Francisco's credit outlook from Stable to Negative in December 2024, vindicating Plaintiff's analysis. San Francisco was downgraded, and investors required to hold only AAA-rated debt were forced to sell at steep losses. San Francisco bond prices declined from eighty-seven dollars and eighty-nine cents ($87.89) in December 2023 to eighty dollars and seventeen cents ($80.17) in December 2024. See Exhibits F, T-U.

41. In the months that followed, Defendant repeatedly retaliated against Plaintiff, forcing him to work long, grueling hours, forcing weekend work, and treating Plaintiff as an enemy. Ultimately, this resulted in a diagnosis of carpal tunnel syndrome for Plaintiff.

42. As such, Plaintiff was promptly targeted and retaliated against for his whistleblower complaints. In a futile and desperate attempt to silence Plaintiff, Defendant quickly began

threatening Plaintiff with threats of termination and performance-related penalties. In August of 2024, Defendant gave Plaintiff an "Inconsistently Meets" performance rating, citing missed deadlines, weak partnerships, and unreceptiveness to feedback. Plaintiff contends this rating was retaliatory and pretextual, issued in response to his ongoing objections to Defendant's market manipulation scheme.

43. In or about November 2024, following the presidential election, Defendant began escalating its scheme as the financial markets experienced tremendous volatility.

44. In December 2024, the banking team led by Ms. Burger and Mr. Burns directed Plaintiff to remove all negative commentary about the deteriorating credit quality of Illinois, California, and MTA bonds. Mr. Peck told Plaintiff that municipal bonds were "a low-margin business" and that Wells Fargo "could not afford to annoy issuers." Mr. Peck further warned Plaintiff that Wells Fargo could "go Citi's way" and shut down its municipal business entirely, which would cost Plaintiff his job. Illinois bonds declined from one hundred dollars and fifty-nine cents ($100.59) to ninety-two dollars and sixty cents ($92.60), California bonds fell from one hundred dollars and fifty cents ($100.50) to eighty-seven dollars and sixty-seven cents ($87.67), and MTA bonds dropped from one hundred dollars and twenty-seven cents ($100.27) to eighty-one dollars and seventeen cents ($81.17). See Exhibits C-E.

45. Also, in December 2024, Mr. Rosenberg and Mr. Lee suppressed Plaintiff's analysis concerning Brightline bonds. Brightline was subsequently downgraded from investment-grade BBB- to speculative-grade BB+ by Fitch in May 2025 and further downgraded to B on July 30, 2025. See Exhibit P.

46. In or about December 2024, Defendant awarded Plaintiff a performance bonus of two

hundred twenty-five thousand dollars ($225,000) for Fiscal Year 2024, consisting of one hundred sixty-eight thousand seven hundred fifty dollars ($168,750) as a cash bonus and fifty-six thousand two hundred fifty dollars ($56,250) in equity awards. This bonus was paid approximately four months before Defendant terminated Plaintiff on the basis of the alleged plagiarism it now cites as cause for his discharge.

47. By in or about January 2025, Defendant once again ramped up and escalated its scheme, seeking to engage as many artificially pumped bonds as possible once it became clear that Democratic states, the largest issuers of municipal bonds, would witness rapid credit deterioration due to reduced Federal support.

48. In January 2025, Plaintiff attempted to warn investors about impending payment delays on American Dream bonds. Mr. Rosenberg prevented publication, stating he did not want to offend Nuveen, the issuer's largest holder.

49. Also in January 2025, Plaintiff asked Mr. Lee and Mr. Peck for permission to discuss the potential decline in California bond prices with investors during his weekly report and call. Plaintiff was denied permission and strictly prohibited from doing so, as both Mr. Lee and Mr. Peck had bonds in their portfolios on behalf of the firm that they needed to unload.

50. In or about January 2025, the disastrous wildfires in Los Angeles threatened the debt-paying ability of multiple bonds issued by entities such as the Los Angeles Department of Water and Power. Plaintiff contacted Mr. Lee and Mr. Peck and requested to discuss the damage to bonds with investors in his weekly report and call. Plaintiff's request was outright denied, and Plaintiff was strictly prohibited from discussing the topic as the bonds were in Defendant's portfolios and needed to be unloaded first. Los Angeles Unified School District bonds subsequently fell from ninety-six dollars and sixty-six cents ($96.66) to

eighty-eight dollars and twenty-eight cents ($88.28), and City of Los Angeles bonds dropped from ninety-nine dollars and forty-two cents ($99.42) to eighty-nine dollars and twenty-nine cents ($89.29). See Exhibits G-H.

51. On February 1, 2025, American Dream bonds missed their semiannual interest payment due to insufficient funds, with the reserve account depleted to just nine hundred sixty-seven dollars ($967). The missed payment adversely affected two hundred eighty-seven million dollars ($287,000,000) of the one billion one hundred million dollars ($1,100,000,000) in municipal bonds financing the East Rutherford mega-mall. See Exhibit O.

52. In February 2025, Mr. Peck and the Wells Fargo banking team prevented Plaintiff from discussing the downgrade risks facing Chicago metropolitan-area bonds. Chicago credits were downgraded in 2025, and bondholders suffered steep losses. Chicago bonds declined from one hundred one dollars and forty-seven cents ($101.47) to eighty-nine dollars and thirteen cents ($89.13), and Chicago Board of Education bonds fell from one hundred dollars and twenty-five cents ($100.25) to eighty-six dollars and ninety-two cents ($86.92). See Exhibits I-J.

53. Throughout this time, Plaintiff continued reporting his complaints against Defendant's unethical schemes, and was, in turn, prohibited from discussing any market or credit deterioration with the firm's clients. Plaintiff's prohibition from discussing any market or credit deterioration was both humiliating and degrading, as Plaintiff is a widely recognized market analyst who has been featured on various news broadcasts throughout the years.

54. In or about February 2025, Defendant began facing steep losses, which it then attempted to push onto its retail investors.

55. In or about February 2025, Plaintiff was interviewed on CNBC, during which time Plaintiff

praised the Trump administration's efforts to reduce the Federal debt and reduce interest rates. These comments enraged Mr. Lee and Mr. Peck, who have strong aversions to the Trump administration and resented Plaintiff's political views. Following Plaintiff's interview, Defendant treated Plaintiff with even more blatant hostility.

56. On or about March 7, 2025, Plaintiff sent an email to Wells Fargo's Chief Executive Officer's office stating that there were issues in the municipal division that he needed to discuss. Plaintiff deliberately kept that email vague and did not use words like “fraud” or “market manipulation” because he knew Wells Fargo monitored employee emails and believed that putting explicit allegations of securities violations in writing would result in his immediate termination.

57. On March 24, 2025, Defendant initiated a formal plagiarism investigation as to allegations against Plaintiff and Mr. Lee permanently halted Plaintiff's weekly reports, accusing Plaintiff of plagiarizing a paragraph from a rating agency report. This was the first plagiarism allegation in Plaintiff's eighteen-month tenure with Defendant, and the first in his eighteen-year career spanning more than one thousand published reports.

58. On March 31, 2025, Defendant interviewed Plaintiff in connection with the investigation. Plaintiff was stunned by the accusation and explained that he had not knowingly or intentionally plagiarized any material, and that the subject report had been drafted and finalized through a collaborative process in which his supervisors held final editing rights. Mr. Lee was adamant that the weekly reports would stop immediately. Mr. Lee did not ask Plaintiff to be more cautious, nor did he reassign the report to another employee. By halting Plaintiff's weekly reports entirely, Defendant in effect suppressed all of Plaintiff's ongoing reporting on the deteriorating municipal market.

59. In more than a decade of preparing similar reports, and across more than one thousand reports published over an eighteen-year career, Plaintiff had never been the subject of a plagiarism or sourcing allegation. Mr. Lee, Mr. Rosenberg, and Ms. Burger all had final editing rights and reviewed the report before finalizing it, and routinely used shared access and Plaintiff's credentials during the collaborative editing process. Any attribution issue in the published report could therefore have been introduced after Plaintiff submitted his draft, without his knowledge or input. Defendant obtained the benefit of publishing the report under Plaintiff's name and credentials but attributed to Plaintiff alone any issue that the collaborative process may have introduced.

60. On April 7, 2025, Plaintiff sent an email to Mr. Rosenberg, Mr. Lee, and Mr. Peck explicitly documenting the systematic suppression of his market analyses, stating that he was being “muzzled” for expressing a “bearish view on the market which was against the firm's interests,” drawing explicit parallels to the “subprime crisis” when “researchers were taken off air in order to prop up prices,” and warning that “firms ended up paying hefty fines for market manipulation” and “some people went to prison.” Plaintiff characterized “an allegation of market manipulation” as “just way too serious an issue to be taken lightly” and warned that “we can be accused of hurting retail investors because, ultimately, they get hurt.” See Exhibit W.

61. On April 8, 2025, Plaintiff emailed the CEO characterizing certain losses as “unconscionable” and stating: “I had predicted the underperformance that we are witnessing and had repeatedly implored my desk to cut down risk ... No one is listening and they seem to be doubling down.” See Exhibit AA.

62. Shortly after Plaintiff sent that email, a representative of the Chief Executive Officer's

office named Andrew Porter contacted Plaintiff to discuss his concerns. See Exhibit BB. During that call, Plaintiff described in detail the market manipulation he had witnessed, including that his supervisors were directing the suppression of his research to protect the firm's inventory positions and its banking relationships, and that he had been prevented from publishing accurate bearish forecasts and credit warnings so that the firm could maintain positive market sentiment while it unloaded its positions. Plaintiff provided Mr. Porter with specific examples of instances in which his supervisors cited business relationships and client sensitivities as reasons to suppress material credit information.

63. During that call, Mr. Porter stated that he would not record the conversation. Plaintiff, however, had not asked him to do so. Plaintiff found this statement unusual because Mr. Porter had contacted Plaintiff specifically to discuss the serious concerns Plaintiff had raised about conduct in the municipal division, yet Mr. Porter stated at the outset that the conversation would not be documented. The call produced no meaningful action and no investigation into the suppression of Plaintiff's research, and the retaliation against Plaintiff intensified.

64. In the weeks that followed, Plaintiff continued complaining of the ongoing market manipulation and what appeared to be clear retaliation in the workplace. However, Plaintiff's complaints were repeatedly dismissed and ignored.

65. Then, on or about April 15, 2025, Defendant abruptly terminated Plaintiff, citing the allegedly plagiarized paragraph. Plaintiff was offered no severance.

66. On April 15, 2025, Defendant filed a U5 termination report with the Financial Industry Regulatory Authority (FINRA) stating that Plaintiff was "Terminated due to failure to adhere to Wells Fargo standards regarding company publications," with the termination

type listed as "Discharged." This report is published on Plaintiff's FINRA BrokerCheck profile and is permanently accessible to all prospective employers in the financial industry. See Exhibit X.

67. Following the U5 filing, UBS, JPMorgan, and RBC Capital Markets each withdrew from recruitment discussions with Plaintiff after reviewing the report.

68. Although Plaintiff subsequently obtained a position at First New York as a macro trader, his compensation is minimal and uncertain, and his reputational harm continues to limit his ability to work in his field.

69. Since Defendant falsely classified Plaintiff's separation as for cause, Plaintiff was denied access to short- and long-term disability benefits, leaving him with more than twenty thousand dollars ($20,000) in unpaid medical expenses.

70. It is crucial to note that Defendant's actions constitute serious violations of federal securities laws, specifically market manipulation and fraud under the Securities Exchange Act of 1934, among others. By artificially suppressing interest rates to inflate bond prices, concealing credit risks, and knowingly selling overvalued, high-risk municipal bonds to unsuspecting and vulnerable investors, Defendant engaged in a deliberate and unlawful scheme to defraud the public. This misconduct is unethical and can lead to civil and criminal penalties, Securities and Exchange Commission (SEC) enforcement, and possibly imprisonment, as it directly harms vulnerable investors and destabilizes the integrity of the U.S. financial markets.

71. Plaintiff engaged in protected activities by repeatedly reporting Defendant's unethical market manipulation and by reporting the resulting retaliation against him.

72. As described herein, immediately after Plaintiff engaged in whistleblower activities,

Defendant retaliated against Plaintiff by creating, maintaining, condoning, and failing to correct a hostile and adverse work environment; by treating Plaintiff with escalating hostility and animosity; by isolating Plaintiff from clients and internal communications; by issuing Plaintiff a pretextual performance rating; by assigning grueling workloads and requiring weekend work; by falsely accusing Plaintiff of plagiarism as a pretext to stop the publication of Plaintiff's reports; by humiliating Plaintiff through restrictions on his ability to speak publicly or with clients about market deterioration; by targeting Plaintiff for discipline following a nationally televised appearance in which Plaintiff expressed views praising the Trump administration, which were contrary to senior management's political preferences; by dismissing Plaintiff's internal complaints and concerns; by refusing to take corrective action despite documented evidence of Plaintiff's objections; by terminating Plaintiff on a fabricated and pretextual basis without cause or justification; and by filing a false and misleading U5 termination report with FINRA, causing the permanent, industry-wide publication of a false for-cause discharge designation on Plaintiff's FINRA BrokerCheck profile, and resulting in the withdrawal of recruitment discussions by UBS, JPMorgan, and RBC Capital Markets.

73. As a result of Defendant's actions, Plaintiff has suffered profound feelings of depression, anxiety, loss of self-esteem, demoralization, loss of confidence, difficulty sleeping, and recurring nightmares.

74. Additionally, Plaintiff has suffered physical manifestations of stress, depression, anxiety, panic attacks, insomnia, isolation, lethargy, and feelings of panic, dread, and hopelessness.

75. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits, and other compensation that such

employment entails, future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**FIRST CAUSE OF ACTION**
**WHISTLEBLOWER DISCRIMINATION AND RETALIATION**
**UNDER THE SARBANES OXLEY-ACT 18 U.S.C. § 1514A**

76. Plaintiff repeats and realleges each and every allegation in paragraphs one through seventy-five as if fully set forth herein.

77. 18 US.C. § 1514A states:

> (a) Whistleblower Protection for Employees of Publicly Traded Companies.— No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> 1) To provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—
>
> (A) a Federal regulatory or law enforcement agency;
>
> (B) any Member of Congress or any committee of Congress; or
>
> (C) A person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

> 2) To file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

78. Defendant is liable for violations of this law. Plaintiff was an "Employee" and an individual who performed services for and under the control and direction of Defendant for wages or other remuneration.

79. Plaintiff engaged in protected activity under 18 U.S.C. § 1514A(a)(1). Throughout 2024 and into 2025, Plaintiff repeatedly objected to his supervisors that Defendant was suppressing material credit-risk information, as alleged above. In early March 2025, Plaintiff escalated his concerns to the Chief Executive Officer's office. On April 7, 2025, Plaintiff sent his supervisors an email that expressly identified market manipulation and harm to retail investors. On April 8, 2025, Plaintiff emailed the Chief Executive Officer about the resulting losses. On April 9, 2025, Andrew Porter contacted Plaintiff regarding his concerns. In each instance, Plaintiff reported conduct that he reasonably believed constituted securities fraud, wire fraud, violations of SEC and MSRB rules, and fraud against investors. Plaintiff's objections did not concern mere editorial or stylistic disagreements; they concerned Defendant's suppression of material information from investors.

80. Defendant knew of Plaintiff's protected activity. Plaintiff escalated his concerns to the Chief Executive Officer's office by email in March 2025. Wells Fargo later acknowledged and followed up on those concerns through Andrew Porter in April 2025. Plaintiff also made objections directly to his supervisors and the Chief Executive Officer by emails dated April 7, 2025 and April 8, 2025.

81. Defendant subjected Plaintiff to unfavorable personnel actions. Defendant issued Plaintiff a pretextual negative performance rating,\, isolated him, halted his weekly reports, initiated a pretextual plagiarism investigation, terminated his employment, and filed a false for-cause U5 report.

82. Plaintiff's protected activity was a contributing factor in Defendant's decisions to halt his reports, investigate him, and terminate his employment. Plaintiff's sustained objections throughout 2024 and early 2025, together with his explicit March and April 7, 2025 written disclosure of market manipulation, preceded each adverse action. The close temporal proximity between March and April 7th disclosures and Plaintiff's termination just eight days later independently supports an inference of causation. Plaintiff need not establish that Defendant acted with retaliatory animus to prove causation under SOX.

83. Defendant's stated reason for Plaintiff's termination, the alleged plagiarism, is pretextual. It was the first such allegation in Plaintiff's eighteen-month tenure and the first in an eighteen-year career spanning more than one thousand published reports. Plaintiff's supervisors drafted and approved the subject reports collaboratively and held final editing rights over them. Defendant, however, shut down Plaintiff's report line entirely.

84. Such retaliatory treatment would dissuade any reasonable employee from making or supporting similar complaints of possible fraud and market manipulation.

85. Plaintiff is entitled to the maximum amount allowed under this law. In addition to compensation, as per 18 US.C. § 1514A(c), Plaintiff seeks and is entitled to: [1] reinstatement with the same seniority status that Plaintiff would have had, but for the discrimination; [2] back pay with interest; and [3] compensation for any special damages

sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

**SECOND CAUSE OF ACTION**
**WHISTLEBLOWER DISCRIMINATION AND RETALIATION**
**UNDER NY LABOR LAW §§ 740(2)**

86. Plaintiff repeats and realleges each and every allegation in paragraphs one through eighty-five as if fully set forth herein.

87. New York Labor Law § 740(2) states:

> 2. Prohibitions. An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:
>
> (a) Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;
>
> (b) provides information to, or testifies before, any public body conducting an investigation, hearing, or inquiry into any such activity, policy, or practice by such employer;
>
> (c) Objects to or refuses to participate in any such activity, policy, or practice.

88. Defendant is liable for violations of this law. Plaintiff was an "Employee" and an individual who performed services for and under the control and direction of Defendant for wages or other remuneration.

89. Plaintiff engaged in protected activities by repeatedly reporting Defendant's unethical market manipulation and by reporting the resulting retaliation against him.

90. As described herein, immediately after Plaintiff engaged in whistleblower activities,

Defendant retaliated against Plaintiff by creating, maintaining, condoning, and failing to correct a hostile and adverse work environment; by treating Plaintiff with escalating hostility and animosity; by isolating Plaintiff from clients and internal communications; by issuing Plaintiff a pretextual performance rating by assigning grueling workloads and requiring weekend work; by falsely accusing Plaintiff of plagiarism as a pretext to stop the publication of Plaintiff's reports; by humiliating Plaintiff through restrictions on his ability to speak publicly or with clients about market deterioration; by targeting Plaintiff for discipline following a nationally televised appearance in which Plaintiff expressed views praising the Trump administration, which were contrary to senior management's political preferences; by dismissing Plaintiff's internal complaints and concerns; by refusing to take corrective action despite documented evidence of Plaintiff's objections; by terminating Plaintiff on a fabricated and pretextual basis without cause or justification; and by filing a false and misleading U5 termination report with FINRA, causing the permanent, industry-wide publication of a false for-cause discharge designation on Plaintiff's FINRA BrokerCheck profile, and resulting in the withdrawal of recruitment discussions by UBS, JPMorgan, and RBC Capital Markets.

91. Such retaliatory treatment would dissuade any reasonable employee from making or supporting similar complaints of possible fraud and market manipulation.

92. Plaintiff is entitled to the maximum amount allowed under this law. In addition to compensation, as per NYLL § 740(5), Plaintiff seeks and is entitled to: [1] reinstatement . . . to the same position held before the retaliatory personnel action, or to an equivalent position; [2] the reinstatement of full fringe benefits and seniority rights; [3] compensation for lost wages, benefits and other remuneration; and [4] the payment by the employer of

reasonable costs, disbursements, and attorney's fees. Plaintiff seeks all of the above remedies as allowed by NYLL § 740[5] and is entitled to the same as a matter of law.

**JURY DEMAND**

93. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by the Sarbanes-Oxley Act and NYLL in that Defendant retaliated against Plaintiff for whistleblowing, created and maintained a hostile work environment, and subjected Plaintiff to a retaliatory and unlawful termination;

B. Declaring that Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court;

C. Reinstating Plaintiff to the same position he held before the retaliatory personnel action, or to an equivalent position, or awarding front pay in lieu of reinstatement;

D. Reinstating full fringe benefits and seniority rights to Plaintiff;

E. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

F. Awarding Plaintiff compensatory damages for mental and emotional injuries, distress, pain and suffering, and injury to his reputation in an amount to be proven;

G. Awarding Plaintiff punitive damages;

H. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

I. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and

proper to remedy Defendant's unlawful employment practices.

Dated: New York, New York
July 22, 2026

**JOSEPH & NORINSBERG LLC.,**

By: /s/ Jitesh Dudani, Esq.
Jitesh Dudani, Esq.
VersionJulie Varghese, Esq.
Executive Partner and Chief of Operations
One World Trade Center, Floor 85
New York, New York 10007
T: (212) 227-5700
F: (212) 656-1889